# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

Nicole Andrea Smith
1633 Booker Court
Baltimore, MD 21217

Jacqueline Kiana Morant
2421 Wilgrey Court
Baltimore, MD 21230

Amy Towson
1663 Vincent Court
Baltimore, MD 21217

Sara Garret
1660 Mountmor Court
Baltimore, MD 21217

Onnaday McIntosh-Griggs
1644 Mountmor Court
Baltimore, MD 21217

Stephanie V. Harris
1641 Vincent Court 1st Floor
Baltimore, MD 21217

Vitina Yvette Thomas
1617 Bakebury Court
Baltimore, MD 21217

v.

Housing Authority of Baltimore City
417 E Fayette St, Suite 1339
Baltimore, MD 21202

Paul T. Graziano
Baltimore Housing Commissioner
417 E Fayette St, Suite 1339
Baltimore, MD 21202

Clinton Coleman
1640 Balmor Court
Baltimore, MD 21217

Case# 1:15 - cv - 2921
JURY TRIAL DEMANDED

Michael Robertson
1640 Balmor Court
Baltimore, MD 21217

Come now the above-named plaintiffs, by and through counsel, Cary J. Hansel of Hansel

Law, PC, and Annie B. Hirsch of Hirsch and Cosca, PC and sue the above-named defendants,

stating as follows:

## <u>INTRODUCTION</u>

1)      This lawsuit is being filed to stop the widespread sexual abuse and harassment

perpetrated by maintenance men against vulnerable women living in Baltimore City public

housing.  The Housing Authority of Baltimore City has known for years, as the result of

numerous complaints, that Maintenance Supervisor Clinton Coleman, Michael Robertson and

other maintenance men demand sex before repairing deplorable conditions in Baltimore's public

housing.

2)      These Housing Authority employees routinely harass and abuse the vulnerable

women in public housing.  By refusing to perform repairs without sexual *quid pro quo*, these

defendants are subjecting the tenants to life-threatening living conditions including, but not

limited to: mold, lack of heat, rodent and insect infestations and risk of electrocution.  These

victims are too poor to move out and relocate their families.  Consequently, they are left with the

impossible choice of either succumbing to unwanted sexual demands in order to save themselves

and their children from life-threatening conditions in their homes, or, living in squalor.

3)      The individual defendants and other Housing Authority employees prey on

females from under-aged girls to women in their 50s and from the able-bodied to the

handicapped.  In addition to their refusal to repair life-threatening conditions if their demands for

sexual *quid pro quo* are not met, at least one defendant has also threatened physical violence

2

against one of the young female plaintiffs if she did not succumb to his sexual demands, while another defendant has offered cash for sex when withholding repairs was insufficient.

4)      These affronts are about power and control over the most vulnerable members of society, including the poor, the young, and the disabled.  In addition to satisfying their prurient sexual desires, the maintenance staff also intimidates and deters women from requesting maintenance repairs by sexually harassing them.  This allows the individual defendants to shirk their duties.

5)      This abuse has run rampant throughout Gilmor Homes, the housing project where Freddie Gray lived before his murder.  Sadly, these abuses are not contained there as Defendants Coleman and Robertson are sometimes assigned to other projects, where they continue their pattern of preying on women, including defenseless single mothers.

6)      The practice of demanding sex for repairs is so widespread that it is a pattern and practice by the Housing Authority of Baltimore City, whose housing officials have repeatedly turned their backs on the most vulnerable city residents.  For years, the Housing Authority of Baltimore City ("the Housing Authority") has ignored numerous complaints and repeatedly allowed abusers to maintain their positions of power.

7)      These abusers hold tremendous power over the women bringing this lawsuit. Defendants Coleman and Robertson:  possess keys to all of their victim's homes which they utilize to come and go as they please, have the ability to have residents evicted, and the ability to ignore badly-needed repairs.  Despite all of this, seven brave women have chosen to come forward.  Their stories are in the Facts section below and in the sworn affidavits attached as Exhibit 1, which are incorporated herein by reference.

## JURISDICTION

8)     Jurisdiction is proper in this Honorable Court under 28 U.S. Code § 1331 because this is a civil action arising under the Constitution, laws, or treaties of the United States.

## VENUE

9)     Venue is proper in this Honorable Court under 28 U.S.C. § 1391 because the parties are domiciled in Maryland, or organized under Maryland law, and the events at issue took place in Baltimore, Maryland.

## PARTIES

10)     Nicole Andrea Smith is an adult citizen of Baltimore, Maryland.

11)     Jacqueline Kiana Morant is an adult citizen of Baltimore, Maryland.

12)     Amy Towson is an adult citizen of Baltimore, Maryland.

13)     Sara Garret is an adult citizen of Baltimore, Maryland.

14)     Onnaday McIntosh-Griggs is an adult citizen of Baltimore, Maryland.

15)     Stephanie V. Harris is an adult citizen of Baltimore, Maryland.

16)     Vitina Yvette Thomas is an adult citizen of Baltimore, Maryland.

17)     The Housing Authority of Baltimore City is a public body corporate and politic created under the laws of the State of Maryland.

18)     The Housing Authority of Baltimore City is *sui juris*.

19)     Paul T. Graziano is the Baltimore Housing Commissioner responsible for the pattern and practice of misconduct discussed herein and being sued in his individual and official capacities.

20)     Clinton Coleman is an adult citizen of Baltimore, Maryland and an employee of the Housing Authority of Baltimore City.

4

21)    Michael Robertson is an adult citizen of Baltimore, Maryland and an employee of the Housing Authority of Baltimore City.

## FACTS

### Nicole Andrea Smith's Story

22)    Nicole Andrea Smith is a 33 year-old female resident of Gilmor Homes, a public housing project in Baltimore, Maryland.  Gilmor Homes is owned and operated by the Housing Authority of Baltimore City.

23)    Ms. Smith is a gainfully-employed single mother.  She has one daughter that lives with her who is currently 8 years old.

24)    In 2008, Ms. Smith, a single woman in her 20's, came to Gilmore Homes with her then one-year old daughter.  She was fleeing an abusive relationship which had culminated in her child's father breaking into her previous home and attempting to kill her.  Prior to that, she had never lived in public housing.

25)    Despite working full time, Ms. Smith was unable to afford to leave Gilmor Homes because her finances were left in shambles as a result of the abusive relationship she had just escaped.

26)    Shortly after Ms. Smith first arrived, the head of maintenance (a man named Clinton Coleman) came to her home to do an "inspection."  Mr. Coleman is employed by the Housing Authority of Baltimore City.

27)    After the "inspection," Mr. Coleman told Ms. Smith that she could get "extra stuff" if she needed it.

28)    Ms. Smith asked Mr. Coleman what he meant by this.  Mr. Coleman responded that he would fix any problems in the apartment if she came to see him in his office where the

two of them could "talk about it."  He looked at her suggestively when he said this, but she did not fully understand what he meant at the time.

29)     The next day, Ms. Smith went to Mr. Coleman's office expecting to discuss the procedures for having repairs made in her home.

30)     Mr. Coleman asked Ms. Smith to come in and close the door.  It was just the two of them in the office.  Ms. Smith inquired, "what do I have to do to get things fixed?"  She expected him to explain the work order procedure to her.  Instead, Mr. Coleman, who was seated at the time, pushed himself back from his desk, unzipped his fly, exposed his penis to her and asked her, "what can you do with this?"

31)     Ms. Smith was shocked.  She was young, scared, had just fled from an abusive relationship, and was worried about the health and safety of her daughter.  She felt she had no choice but to give in to Mr. Coleman's demands.  So she did as he had asked and performed oral sex on him.

32)     Afterward, Ms. Smith left his office.

33)     Ms. Smith was scared and ashamed.  She desperately tried to forget about the incident and made every effort to avoid Mr. Coleman.

34)     As additional problems arose with her unit, Ms. Smith followed procedure and made official requests for repairs (also known as "work orders") with the housing office.  Initially, all of her work orders were timely addressed.  She noticed, however, that other women were not getting the same level of service she received.

35)     As time went by, Mr. Coleman began to ignore Ms. Smith's requests for repairs.

36)     Although she tried to avoid him, when Ms. Smith did see Mr. Coleman, he frequently demanded intercourse or oral sex from her.  These sexual demands have continued throughout her time at Gilmor and persist to the present.

37)     Badly needed repairs in Ms. Smith's unit were ignored and remained unaddressed for long periods of time.

38)     Ms. Smith became more and more afraid of Mr. Coleman during this period.  Mr. Coleman controls a large group of male maintenance workers, some of whom also engage in this abusive behavior.

39)     Frequently, maintenance workers would make sexual remarks to Ms. Smith about her body, including, but not limited to, comments about her buttocks.  Maintenance workers have continued to make unwanted and aggressive remarks toward Ms. Smith throughout her time at Gilmor, to the present.

40)     There came a time when Ms. Smith discovered a gas leak behind her stove.  She could smell the gas and was in fear for her life and the life of her daughter.  She could no longer avoid Mr. Coleman.

41)     Ms. Smith went to Mr. Coleman's office to request that the gas leak be fixed.  He said that he could not smell the leak from his office across the street, but that he would come by her home after hours.

42)     Mr. Coleman came to Ms. Smith's house that evening around 10:00 p.m.  Ms. Smith opened the door.  Mr. Coleman entered immediately and, without saying anything, put his hands on her and proceeded to have sex with her in the front room.

43)     Ms. Smith did not physically or verbally encourage Mr. Coleman.   She was disgusted and wanted it to end as quickly as possible.  To get through the ordeal, Ms. Smith focused on her safety and the safety of her daughter.

44)     When Mr. Coleman was finished, he left.

45)     The next day, workmen directed by Mr. Coleman arrived at Ms. Smith's home and fixed the gas leak.

46)     After that, Mr. Coleman began to ignore Ms. Smith's work orders again.

47)     Among other problems that had accrued, an earthquake caused a portion of one of Ms. Smith's walls to begin to cave in.

48)     At one point, Ms. Smith's front door was broken and did not close properly.  She was afraid for her safety because the door would not latch properly and someone could have easily broken in.

49)     Gilmor Homes is located in an extremely high crime area.  Ms. Smith was so scared that she would pile heavy objects against the door at night.  However, this also made her worry that in the event of a fire, she and her daughter would be trapped inside.

50)     Ms. Smith also suffered, at times, with insufficient heat in the house.

51)     Ms. Smith put in work orders whenever problems arose, but they were ignored.

52)     Ms. Smith's next door neighbor warned her that if she did not continue to give in to Mr. Coleman's sexual demands, in addition to allowing her unit to go unrepaired, Mr. Coleman would send other women to physically assault Ms. Smith.  Upon information and belief, the reason why these women would follow Mr. Coleman's directions in this regards would be so that they could avoid having to perform sexual favors for Mr. Coleman in exchange

for repairs being done to their homes.   Ms. Smith believed that Mr. Coleman told the neighbor to pass this threat along to her.

53)     After she received Mr. Coleman's threat through her neighbor, Ms. Smith was petrified.

54)      Mr. Coleman maintains significant power over the Gilmor community, which he exhibits in a most reprehensible manner.  In addition to withholding repairs and making physical threats, he and his maintenance crew have the ability to make complaints that may result in residents losing their homes.

55)     Ms. Smith and her daughter have no place else to go.  Consequently, they would be homeless if this happened.

56)     For all of these reasons, but primarily out of fear and in an effort to protect her daughter, Ms. Smith gave in to Mr. Coleman's demands for sexual intercourse a total of four times and oral sex once.  These encounters occurred in his office and in her home.  At least three of these events occurred within the last three years.

57)      After each respective time that Ms. Smith gave in to Mr. Coleman's demands, Mr. Coleman would have his maintenance crew complete the long-overdue work in her unit.

58)      In approximately late 2013/early 2014, Mr. Coleman referenced Defendant Michael Robertson in a conversation with Ms. Smith.  Mr. Coleman told Ms. Smith, "if you help Mike 'get some,' we'll do your work orders."  "Mike" was another maintenance technician employed by the Housing Authority of Baltimore City.  "Mike" is supervised by Mr. Coleman.

59)      By this time, the stress of living with what she was being forced to do was overwhelming.  Ms. Smith was doing everything possible to avoid Mr. Coleman.  She even

arranged her work schedule so that she could leave her home before he arrived and return after he had left for the day.

60)     Mr. Coleman's office is directly across from Ms. Smith's house and he can watch her come and go, so there is ultimately no escaping him.  When she sees him, he makes suggestive comments and faces which make her feel ill.

61)     Ms. Smith could not stand the thought of this happening with another man.  So, she refused to "help Mike 'get some.'"  As a result, Mr. Coleman has prevented any further significant work from being done to her house.

62)     In early 2014, Ms. Smith went to Mr. Coleman's boss, Ms. Emma Scott, the property manager.  Ms. Scott is an employee of the Housing Authority of Baltimore City.  Ms. Smith explained to Ms. Scott everything that is included in this Complaint in even greater detail.  Ms. Scott listened to everything Ms. Smith had to say and offered no response at all.  She just sat there.  After a long pause, Ms. Smith said thank you for listening to me and left.  Shortly thereafter, Ms. Scott retired.  Ms. Smith never heard back from anyone regarding the discussion.

63)     Currently, there are numerous unaddressed health and safety issues in Ms. Smith's home, including: a radiator which leaks and will not provide heat for the coming winter, a bathroom heater that does not work, clogged drains, broken doors, broken windows and broken cabinets.  All of these items are reflected in work orders that have been pending for months or longer.

**Jacqueline Kiana Morant's Story**

64)     Jacqueline Kiana Morant, is a 29 year-old female resident of Westport, a public housing project in Baltimore, Maryland.  Westport is owned and operated by the Housing Authority of Baltimore City.  Ms. Morant moved to Westport in October of 2010.

10

65)     In late 2013, Defendant Coleman came to her home to replace her blinds.

66)     Ms. Morant had heard stories of widespread sexual harassment by maintenance workers in Baltimore City public housing.  Therefore, she used her mobile phone to videotape Mr. Coleman while he was in her home.

67)     Shortly after Mr. Coleman arrived, a male cousin of Ms. Morant's arrived.  He also witnessed some of the events which transpired.

68)     After removing the upstairs blinds, Mr. Coleman came downstairs where Ms. Morant was visiting with her cousin.

69)     Without provocation, Mr. Coleman looked at Ms. Morant and said, "I want you.  I just want you."  Mr. Coleman then went on to tell Ms. Morant disgusting stories of him looking up women's nightgowns when he is doing repairs, and women having sex with the maintenance men.

70)     Ms. Morant was shocked and appalled.  She had done nothing to encourage this behavior.

71)     After Mr. Coleman left, Ms. Morant contacted the rental office to complain about this behavior.  Ms. Morant spoke to Mr. Coleman's supervisor.  When that complaint went nowhere, Ms. Morant called the Housing Authority of Baltimore City and spoke to Lamont Bivens.  Ms. Morant repeatedly followed up with Mr. Bivens.  She even sent him a copy of the video tape.  Mr. Bivens eventually responded by telling Ms. Morant that she was not the first person to complain about Mr. Coleman.

72)     Mr. Coleman left the community for a short period and then came back.  When he came back, every time he saw Ms. Morant, he would give her dirty looks and give her "the finger."

73)      Ms. Morant never heard back from Mr. Bivens with a solution.

74)      Ms. Morant has observed Mr. Coleman harassing other women and young girls. In the summer of 2015, Ms. Morant observed Mr. Coleman soliciting underage girls in the community.  Ms. Morant contacted Lamont Bivens again.  Mr. Bivens took her complaint. Once again, nothing was done.

75)      Mr. Coleman looks at Ms. Morant in a threatening manner whenever she sees him.  Mr. Coleman has keys to her house.  Other women have told Ms. Morant that Mr. Coleman enters their homes uninvited, without knocking, when they are awake and while they are sleeping.  Understandably, Ms. Morant is extremely afraid of Mr. Coleman.

**Amy Towson's Story**

76)      Amy Towson is a 38 year-old female resident of Gilmor Homes, a public housing project in Baltimore, Maryland.  She moved in to Gilmor Homes in 2011.

77)      In the spring of 2012, Ms. Towson's unit needed repairs so she contacted the maintenance crew.  Defendant Michael Robertson came to her home.  He asked if he could come back in an hour and a half and she agreed.

78)      When Mr. Robertson came back, he said he would pay Ms. Towson "for a date" if she let him "come over" and that he "pays the girls in Gilmor well."  He then grabbed her breast.

79)      Ms. Towson was shocked and appalled.  She had done nothing to encourage this behavior.  She told him to stop and asked him to leave.

80)      Ms. Towson immediately contacted Ms. Emma Scott, the property manager and Defendant Robertson's boss, to voice her complaints.  Ms. Towson told Ms. Scott everything that happened.  Ms. Scott told her that when she calls for maintenance, she should just request that Mr. Robertson not come to her house.  Ms. Scott took no further action as far as Ms. Towson

is aware.  After the meeting, Ms. Towson never heard from anyone again in connection with her complaint.

81)      In retaliation for voicing her concerns and complaints to Ms. Scott, the maintenance crew, including Defendants Coleman and Robertson, refused to perform repairs in a timely manner in Ms. Towson's home.

82)      Furthermore, instead of doing the necessary repairs, Mr. Robertson waits outside Ms. Towson's home for long periods of time and stares at her house.  Ms. Towson believes Mr. Robertson does this to show her that he has time to do the repairs and he could do the repairs if he wanted to, but he chooses not to.

83)      Even now, four years later, there are major problems with Ms. Towson's unit which maintenance continues to refuse to address.

84)      Among other issues, Ms. Towson's unit has unrepaired leaking pipes.  When she runs the shower, a puddle forms on the floor from water seeping through the walls.  Ms. Towson followed proper procedure and filed a "work order" five months ago to have this repaired.  She was ignored.

85)      The leak has led to mold in all four rooms.  The mold is so bad that Ms. Towson has had to throw away furniture.  Furthermore, her health and the health of her children has been endangered by the mold. She has coughed up blood and she fears for the health of her two-year old daughter and her five-year-old son who takes asthma medicine and who now gets frequent nose bleeds.  Ms. Towson has continued to follow the proper procedures and has filed a "work order" to have this repaired.  She was ignored.

86)     In addition to the leaky pipes and mold, Ms. Towson's windows do not properly lock.  As such, her home remains unsecured in this high crime area.  She followed proper procedure and filed a "work order" to have this repaired.  She was ignored.

**Sara Garret's Story**

87)     Sara Garret is a 31-year-old resident of Gilmor Homes.  She currently resides there with her four children who range in age from four to twelve-years old.

88)     Ms. Garret has lived in Gilmor for four years.  Three years ago, Defendants Robertson and Coleman began harassing her.

89)     There came a time when Ms. Garret needed repairs in her home.  She properly put in work orders with the office, however, the repair requests remained unaddressed.  Subsequently, Ms. Garret went to Mr. Coleman's office to follow up on the overdue work orders.  He told her that she looked good for having four children.  He leered at her and continued to make unwanted advances.  Ms. Garret told Mr. Coleman that she did not come to his office to be treated like that and she wanted to know about her repairs.

90)     In addition to the unaddressed repairs and the unwanted advances of Mr. Coleman, Defendant Robertson has entered Ms. Garret's house unannounced on multiple occasions.  In one instance, Ms. Garret was in the shower when Mr. Robertson entered without invitation or permission.  When Ms. Garret discovered him in the house, he quickly left without doing any repairs.

91)     Every time Ms. Garret has called maintenance, she has been sexually harassed and each time she has made it clear to these men that these sexual advances are unwelcomed.

92)     In addition to problems with Defendants Robertson and Coleman, other maintenance men at Gilmor Homes engage in cat calling and honking their horns at the women

14

residents.  This behavior is not only permitted, but is often encouraged by their supervisor, Mr. Coleman.

93)     Because she has repeatedly rejected their advances, Defendants Robertson and Coleman have refused to perform the much needed repairs in Ms. Garret's home.

94)     Ms. Garret's home currently has numerous defects, many of which are life-threatening to her and her four young children.  These defects include: electrical sockets hanging out of the wall by exposed wires, a broken stove, mold, chipped paint, rodent and roach infestations, holes in the walls, broken baseboards and windows that do not function properly. The mold is so rampant that Ms. Garret has had to throw out otherwise perfect furniture.  Given the hostile environment and the dilapidated living conditions, Ms. Garret continues to fear for the health and safety of her family while residing at Gilmor Homes.

**Onnaday McIntosh-Griggs' Story**

95)     Onnaday McIntosh-Griggs is an adult female resident of Gilmor Homes.  She is employed full-time as a Certified Nursing Assistant, providing one-on-one care for the elderly.

96)     In 2014, Ms. McIntosh-Griggs spoke to Mr. Coleman, asking him when he was going to perform repairs in her home.  Mr. Coleman responded, "when are you going to let me come see you at your house?"  Ms. McIntosh-Griggs refused his advances and the repairs were never done.

97)     On another occasion, Ms. McIntosh-Griggs lost electrical power in her home. She placed a call for service and Mr. Coleman responded.  Mr. Coleman looked at her suggestively and said, "it looks nice in here; it looks good in here; you want to go upstairs?" Again, Ms. McIntosh-Griggs refused his advances.

98)     On another occasion, Ms. McIntosh-Griggs went to the rental office to ask about necessary repairs to her floors.  Mr. Coleman responded, "I can wax your floors, I'll give you some wax alright." Again, Ms. McIntosh-Griggs refused his advances.

99)     On yet another occasion when Ms. McIntosh-Griggs was in the rental office, Mr. Coleman came up behind her and rubbed his erect penis on her buttocks.  Again, she made it abundantly clear that this was unwelcome.

100)    As a result of Ms. McIntosh-Griggs' rejection of these advances, Mr. Coleman has refused to properly follow up on her requests for services, allowing dangerous conditions to fester in her home, unabated.

101)    The deplorable conditions in Ms. McIntosh-Griggs' home include: peeling paint, a rat infestation, a hole in the kitchen ceiling with water leaking from the upstairs toilet (this prevents her from cooking in the kitchen), tiles falling off of the shower walls, a toilet which is not secured to the floor, a heater leaking water in the kitchen (which maintenance just turned off instead of fixing, so she now has no heat in the kitchen with the winter coming), no heat in two of her five rooms, windows that do not open, gaps around the windows allowing cold air to come in, and a broken refrigerator.

**Stephanie V. Harris' Story**

102)    Stephanie V. Harris, a female resident of Gilmor Homes, moved in to the community on February 10, 2014,

103)    In the spring of 2014, Ms. Harris's unit needed repairs.  When propositioned, she refused to provide sexual favors for Mr. Coleman in exchange for said repairs.

104)    In response to her refusal, Defendant Coleman replied "you don't want to get with me?  You think you are having problems now, just wait."   This response was an unequivocal

threat to Ms. Harris that if she did not acquiesce to Mr. Coleman's sexual demands, then her unit would not be repaired.

105)    Mr. Coleman made good on his threat after Ms. Harris refused to sleep with him. Repairs to Ms. Harris' home were not timely performed by Mr. Coleman, or his maintenance crew.

106)    Currently, the following issues are unabated in Ms. Harris' unit: the bathtub knob is broken and Ms. Harris must operate her bathtub with plyers, there is a roach infestation, there are rodents and rodent feces in her cabinets, there are sockets dangling from the walls by their wires, her windows are not the correct size for their frames leaving air gaps and her windows do not lock (an obvious security danger that has resulted in Ms. Harris having three microwaves and a video camera stolen from her home).

**<u>Vitina Yvette Thomas's Story</u>**

107)    Vitina Yvette Thomas is a 54-year-old disabled resident of Gilmor Homes who walks with a cane.  There are numerous defects in her home which continue to be ignored by the maintenance staff, despite Ms. Thomas' requests for repairs.

108)    Within the last three years, Michael Robertson told Ms. Thomas that if she did not "give him some booty, he would not make repairs to her unit."

109)    Within the last 6 months, Defendant Robertson came to Ms. Thomas' house after a male visitor had just left.  Defendant Robertson said to Ms. Thomas, "I see your boyfriend just left, can I get a turn?"  She rejected his advances and he left without doing any of the long-outstanding work so badly needed in her home.

110)    Among other issues in her home, Ms. Thomas suffers with mold, rusty yellow and brown water, and rats that are so prevalent and brazen that they recently consumed half of a loaf

of bread on her counter over the course of one night.  In addition, Ms. Thomas requires

accommodations for her disability which have not been provided.  These accommodations

include the installation of ramps, as well as the installation of handles on the bathroom wall in

order to assist her in using the bathtub and toilet.

111)    The maintenance crew, including Defendants Robertson and Coleman, refuse to

perform any of these repairs because Ms. Thomas has rejected their sexual advances.

**Additional Facts**

112)    Defendants Robertson and Coleman are employees of the Housing Authority of

Baltimore City, acting under color of State and local law.

113)    Defendants Robertson and Coleman knew or should have known that their sexual

advances were unwelcome.

114)    Defendants Robertson and Coleman have a special relationship with the residents

of public housing in Baltimore in that they are in positions of trust, holding keys and with access

to the homes of the hundreds of residents whose units they are charged with repairing.

Defendants Robertson and Coleman abused their positions of power and trust.

115)    At all times relevant hereto, the Housing Authority of Baltimore City and

defendant Graziano knew or should have known of the abuses taking place in Baltimore public

housing.  Ample notice was provided through repeated complaints stretching back for years.

116)    The abuses outlined herein are not limited to the women who have chosen to

come forward.  In fact, they represent only a small fraction of the women subjected to this

behavior by maintenance workers employed by the City of Baltimore.

117)    The plaintiffs have suffered physical violations of their persons in the form of

unwanted physical and sexual contact.

118)     The plaintiffs have suffered actual economic losses in the form of time away from work, efforts to make repairs themselves, property stolen as a result of the failure of the defendants to secure the plaintiff's homes and property destroyed by mold, as well as rodent and insect infestations.

119)     The plaintiffs and their children have suffered severe physical harm as a result of the refusal of Baltimore employees to repair their homes, including exposure to disease, mold, rodent feces, roaches, and a wide variety of other dangerous conditions.

120)     The plaintiffs and their children have suffered severe mental pain, suffering and anguish as a result of all of these abuses.  This mental pain and suffering manifests itself physically through vomiting, heightened blood pressure, heightened heart rate, sweating, sleeplessness, flushing, tremors, headache, loss of sleep, loss of appetite, nervousness and panic.

121)     The violations at issue are continuing in nature.  Defendants Coleman and Robertson have deliberately withheld and delayed repairs as a result of not receiving sexual favors up to and including the present.  Defendants Housing Authority and Robertson have failed to intervene or take any steps to address the problem.  The plaintiffs are currently subject to the unlawful policy that if they want repairs, they must acquiesce to the sexual demands of defendants Coleman and Robertson.  Moreover, in addition to the fact that the *quid pro quo* aspects of the harassment at Gilmor is continuing, so is the hostile environment created by the defendants.  The plaintiffs are subject to a hostile environment every day through lewd and lascivious requests and comments from maintenance men, cat calls, horn honking, and physical sexual assaults or the threat thereof.

122)     Recently, an investigation by a local grassroots organization, Communities United, brought these concerns to light.  Thereafter, Mr. Coleman was transferred out of Gilmor.

Only then, with Mr. Coleman gone, did the seven plaintiffs feel safe enough to come forward and retain counsel.  Thus, the fear and intimidation sown by defendant Coleman kept these women from coming forward sooner.  That fear is reasonable given the physical assaults and threats of the same with which Mr. Coleman controlled his victims.  Unfortunately, since counsel has been retained and despite many of the concerns raised herein having become public, the defendants have returned Mr. Coleman to Gilmor, where he is once again preying on the plaintiffs and others.  Upon information and belief, this was done intentionally by the Housing Authority of Baltimore City and defendant Graziano in retaliation for the complaints and in a futile effort to intimidate the plaintiffs from moving forward with the filing of this Complaint and others efforts to address the ongoing harassment.

## CLAIMS FOR RELIEF

### COUNT I – FAIR HOUSING ACT
### *QUID PRO QUO* SEXUAL HARRASSMENT
### (All Plaintiffs Versus All Defendants)

123)     All paragraphs of this complaint, whether found above or below, not falling under this count, are incorporated herein by reference as if fully stated under this count.

124)     The plaintiffs are all women and, thus, members of a protected class.

125)     The Housing Authority of Baltimore City receives federal funding to operate the housing projects where the plaintiffs reside and suffered discrimination.

126)     The plaintiffs suffered discrimination on the basis of sex at the hands of the defendants in the sale or rental of housing.

127)     Sex or sexual favors were demanded of the female plaintiffs by those in control of their housing in return for livable housing and housing benefits.  These demands were unwelcome.  Similar demands were not made of male residents.

128)    The plaintiffs who refused the defendants' demands suffered adverse housing actions as a direct and proximate result of their refusal.  They were denied housing or substantial benefits of housing.  In particular, repairs were intentionally left undone to the point that their homes are no longer safely habitable.

129)    The Housing Authority of Baltimore City and Baltimore Housing Commissioner Paul T. Graziano knew, or should have known, of the harassment given the many complaints made stretching back over the years.  These defendants failed to timely and properly investigate, stop the harassment and otherwise remedy the situation.

WHEREFORE, the plaintiffs each demand TEN MILLION DOLLARS ($10,000,000.00) in compensatory damages, punitive damages in an amount to be determined by a jury, costs and attorneys' fees, injunctive relief in the form of an order that all health or safety concerns in their homes be immediately abated, and such other relief as this Honorable Court deems appropriate.

## COUNT II – FAIR HOUSING ACT
## HOSTILE ENVIRONMENT SEXUAL HARRASSMENT
## (All Plaintiffs Versus All Defendants)

130)    All paragraphs of this complaint, whether found above or below, not falling under this count, are incorporated herein by reference as if fully stated under this count.

131)    The plaintiffs routinely suffer unwelcome behavior of a sexual nature that creates an intimidating, hostile or abusive housing environment and has the effect of unreasonably interfering with a tenant's housing.

132)    Maintenance men, including defendants Coleman and Robertson have made repeated unwanted sexual advances, sexual threats and have touched the female plaintiff tenants in a sexual way when these women do not want him to.

133)     The plaintiffs are subjected to unwelcome and extensive sexual harassment in the form of sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature, which has not been solicited or desired and which is undesirable or offensive.

134)     The harassment was based on sex.  But for the plaintiff's gender, the harassment would not have taken place.

135)     The harassment makes continued tenancy burdensome and significantly less desirable than if the harassment were not occurring.

136)     The harassment occurs with a high frequency, including virtually every time the plaintiffs are forced to have contact with defendants Coleman and Robertson and other members of the maintenance crew.

137)     The harassment often rises to the level of being physically threatening or humiliating.

138)     The defendants conduct has resulted in severe psychological harm evidenced by physical reactions in some of the plaintiffs, including the loss of sleep, becoming physically ill to the point of vomiting, as well as sweating, flushing, shaking, increased heart rate and panic reactions associated with extreme anxiety and fear.

139)     As demonstrated above, there have been a series of harassing incidents occurring unabated over the course of years.

140)     The plaintiffs have suffered sexual batteries in their own homes or in their communities by defendants Coleman and Robertson, whose very role was to provide a safe environment.

141)     The sexual harassment suffered by the plaintiffs is severe and pervasive.

142)     The plaintiffs who refused the defendants' demands suffered adverse housing actions as a direct and proximate result of their refusal.  They were denied housing or substantial benefits of housing.

143)     The Housing Authority of Baltimore City and Baltimore Housing Commissioner Paul T. Graziano knew or should have known of the harassment given the many complaints made stretching back years.  These defendants failed to timely and properly investigate, stop the harassment and otherwise remedy the situation.  These defendants have not properly informed their agents or employees that they cannot engage in sexual harassment, have no or insufficient procedures for bringing complaints of sexual harassment to their attention and having them remedied, and repeatedly ignore complaints of sexual harassment.

WHEREFORE, the plaintiffs each demand TEN MILLION DOLLARS ($10,000,000.00) in compensatory damages, punitive damages in an amount to be determined by a jury, costs and attorneys' fees, injunctive relief in the form of an order that all health or safety concerns in their homes be immediately abated, and such other relief as this Honorable Court deems appropriate.

## COUNT III – CIVIL RIGHTS
## ACT DUE PROCESS CLAIM
### (All Plaintiffs Versus All Defendants)

144)     All paragraphs of this complaint, whether found above or below, not falling under this count, are incorporated herein by reference as if fully stated under this count.

145)     The defendants were, at all relevant times, acting "under color of law," pursuant to Baltimore City's charter, codes, ordinances and regulations.

146)     The plaintiffs were deprived of their constitutional rights as well as their rights as described above under the Fair Housing Act, a federal statute.

23

147)    With respect to the United States Constitution, the plaintiffs were denied the right to due process of law insofar as their complaints went unaddressed despite controlling law requiring remedy and they were summarily punished by agents of the government.

148)    The plaintiffs have a liberty interest in the right to be secure in their person, both at home and in their community.  This interest was violated when the defendants touched the plaintiffs in unwanted ways, threatened their physical safety and security, and created a hostile environment through continued and excessive sexual harassment.

149)    There are no adequate procedural safeguards in place to prevent this abuse, or adequately address it after it has occurred.  Moreover, what procedures do exist have not been followed by the defendants, which allows the abuse to continue unabated.

150)    In addition to their procedural due process claims, the plaintiffs assert substantive due process claims because they were physically assaulted as described elsewhere herein, without due process of law.

151)    To whatever extent it is determined that the plaintiffs were "seized" for purposes of the Fourth Amendment to the United States Constitution, the plaintiffs hereby assert a Fourth Amendment claim for excessive force.

WHEREFORE, the plaintiffs each demand TEN MILLION DOLLARS ($10,000,000.00) in compensatory damages, punitive damages in an amount to be determined by a jury, costs and attorneys' fees, injunctive relief in the form of an order that all health or safety concerns in their homes be immediately abated, and such other relief as this Honorable Court deems appropriate.

## COUNT IV – CIVIL RIGHTS
## ACT EQUAL PROTECTION CLAIM
### (All Plaintiffs Versus All Defendants)

152)    All paragraphs of this complaint, whether found above or below, not falling under this count, are incorporated herein by reference as if fully stated under this count.

153)    The female plaintiffs are treated differently than their similarly-situated male counterparts, based solely on their sex.

154)    The plaintiffs are singled out for harassment by the defendants.  Similarly situated males suffer no harassment.

155)    There is not a rational basis, legitimate state purpose, or compelling governmental interest in the harassment and discrimination at issue.

156)    The plaintiffs are being intentionally singled out because of their sex.  As such, they are members of a suspect classification and the harassment must be viewed with strict scrutiny.

157)    The harassment at issue interferes with the plaintiffs' fundamental rights to physical security, to be secure in their homes and to privacy.

WHEREFORE, the plaintiffs each demand TEN MILLION DOLLARS ($10,000,000.00) in compensatory damages, punitive damages in an amount to be determined by a jury, costs and attorneys' fees, injunctive relief in the form of an order that all health or safety concerns in their homes be immediately abated, and such other relief as this Honorable Court deems appropriate.

## COUNT V – MARYLAND CONSTITUTION
## ARTICLES 24 & 26 DUE PROCESS CLAIM
### (All Plaintiffs Versus All Defendants)

158)    All paragraphs of this complaint, whether found above or below, not falling under this count, are incorporated herein by reference as if fully stated under this count.

WHEREFORE, the plaintiffs each demand TEN MILLION DOLLARS ($10,000,000.00) in compensatory damages, punitive damages in an amount to be determined by a jury, costs and attorneys' fees, injunctive relief in the form of an order that all health or safety concerns in their homes be immediately abated, and such other relief as this Honorable Court deems appropriate.

### COUNT VI – MARYLAND CONSTITUTION
### ARTICLES 24 & 26 EQUAL PROTECTION CLAIM
### (All Plaintiffs Versus All Defendants)

159)    All paragraphs of this complaint, whether found above or below, not falling under this count, are incorporated herein by reference as if fully stated under this count.

WHEREFORE, the plaintiffs each demand TEN MILLION DOLLARS ($10,000,000.00) in compensatory damages, punitive damages in an amount to be determined by a jury, costs and attorneys' fees, injunctive relief in the form of an order that all health or safety concerns in their homes be immediately abated, and such other relief as this Honorable Court deems appropriate.

### COUNT VII – ASSAULT
### (All Plaintiffs Versus Defendants Coleman and Robertson)

160)    All paragraphs of this complaint, whether found above or below, not falling under this count, are incorporated herein by reference as if fully stated under this count.

161)    Defendants Coleman and Robertson intentionally threatened the plaintiffs, without legal cause or excuse, while possessing the actual and apparent present ability to carry out the threats.

162)    The actions of defendants Coleman and Robertson raised in the plaintiffs' minds a reasonable apprehension of imminent bodily harm.

163)    As a result of the defendants' actions, the plaintiffs suffered and continue to suffer severe mental anguish as well as physical pain and suffering.

WHEREFORE, the plaintiffs each demand TEN MILLION DOLLARS ($10,000,000.00) in compensatory damages, punitive damages in an amount to be determined by a jury, costs and attorneys' fees, injunctive relief in the form of an order that all health or safety concerns in their homes be immediately abated, and such other relief as this Honorable Court deems appropriate.

## COUNT VIII – BATTERY
### (Plaintiffs Smith and McIntosh-Griggs Versus Defendant Coleman)
### (Plaintiff Towson Versus Defendant Robertson)

164)    All paragraphs of this complaint, whether found above or below, not falling under this count, are incorporated herein by reference as if fully stated under this count.

165)    Defendants Coleman and Robertson intentionally touched certain plaintiffs as described above.

166)    The touching was deliberate, undertaken with actual malice, and was offensive and non-consensual.

167)    As a result of the defendants' actions, the plaintiffs suffered and continue to suffer severe mental anguish as well as physical pain and suffering.

WHEREFORE, the plaintiffs each demand TEN MILLION DOLLARS ($10,000,000.00) in compensatory damages, punitive damages in an amount to be determined by a jury, costs and attorneys' fees, injunctive relief in the form of an order that all health or safety concerns in their homes be immediately abated, and such other relief as this Honorable Court deems appropriate.

## COUNT IX – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (All Plaintiffs Versus All Defendants)

168)    All paragraphs of this complaint, whether found above or below, not falling under this count, are incorporated herein by reference as if fully stated under this count.

169)    The defendants' conduct, as described elsewhere herein, was intentional, reckless, and in deliberate disregard of a high degree of probability that emotional distress would result to the plaintiffs.

170)    The defendants' conduct, as described elsewhere herein, was extreme, outrageous and beyond the bounds of decency in society.

171)    The defendants' conduct, as described elsewhere herein, was malicious, willful and intentional.

172)    As a result of the defendants' actions, the plaintiffs suffered and continue to suffer severe and extreme emotional distress as evidenced by physical symptoms such as vomiting, loss of sleep, elevated heart rate, excessive sweating, flushing, nervousness and panic attacks.

WHEREFORE, the plaintiffs each demand TEN MILLION DOLLARS ($10,000,000.00) in compensatory damages, punitive damages in an amount to be determined by a jury, costs and attorneys' fees, injunctive relief in the form of an order that all health or safety concerns in their homes be immediately abated, and such other relief as this Honorable Court deems appropriate.

## COUNT X – FAIR HOUSING ACT AND REHABILITATION ACT OF 1973 DISABILITY DISCRIMINATION
### (Vitinia Yvette Thomas Versus All Defendants)

173)    All paragraphs of this complaint, whether found above or below, not falling under this count, are incorporated herein by reference as if fully stated under this count.

174)    Plaintiff Vitina Yvette Thomas is an individual with a disability in that she suffers from an impairment in her knee which substantially limits one or more major life activities.

175)    The defendants own, lease, or operate Ms. Thomas' rental unit.

176) Plaintiff Vitina Yvette Thomas suffers the discriminatory effects of architectural barriers due to the defendants' failure to install accommodating fixtures, including a ramp and hand holds in the bathroom, in the plaintiff's unit.

177) The defendants are aware of Ms. Thomas' disability and she has repeatedly requested reasonable and tenable accommodations to no avail. The accommodations at issue present no undue administrative or financial burden to the defendants.

178) Ms. Thomas' paperwork entitled her to accommodations, but they have not bene installed.

179) The defendants discriminated against plaintiff on the basis of her disability

180) The defendants failed and refused, despite request, to make reasonable accommodations in rules, policies, practices, or services and such accommodations are necessary to afford Ms. Thomas the equal opportunity to use and enjoy her dwelling.

WHEREFORE, the plaintiffs each demand TEN MILLION DOLLARS ($10,000,000.00) in compensatory damages, punitive damages in an amount to be determined by a jury, costs and attorneys' fees, injunctive relief in the form of an order that all health or safety concerns in their homes be immediately abated, and such other relief as this Honorable Court deems appropriate.

## COUNT XI – NEGLIGENT HIRING, TRAINING, RETENTION & SUPERVISION
### (All Plaintiffs Versus the Housing Authority of Baltimore City and Paul T. Graziano)

181) All paragraphs of this complaint, whether found above or below, not falling under this count, are incorporated herein by reference as if fully stated under this count.

182) Defendants Housing Authority of Baltimore City and Paul T. Graziano bear direct responsibility for the hiring, retention and supervision of defendants Coleman and Richardson.

183)   Defendants Housing Authority of Baltimore City and Paul T. Graziano knew or should have known, prior to hiring defendants Coleman and Richardson, that they were unfit for the duties of their job and dangerous to the women in question.  A review of the Maryland Case Search website reveals numerous criminal convictions under the name, Michael Robertson in Baltimore and numerous civil judgments against an individual named Clinton Coleman in Baltimore.

184)   This publicly-available information is sufficient to place the other defendants on notice that defendants Coleman and Richardson are unfit for duties which include being entrusted with such power of the residents of Baltimore's public housing and the keys to their apartments.

185)   Defendants Housing Authority of Baltimore City and Paul T. Graziano failed to exercise their duty to provide any training sufficient to prevent the sexual harassment and other misconduct outlined herein.

186)   Defendants Housing Authority of Baltimore City and Paul T. Graziano failed to exercise their duty to properly supervise defendants Coleman and Richardson so as to prevent the sexual harassment and other misconduct outlined herein.

187)   Defendants Housing Authority of Baltimore City and Paul T. Graziano knew or should have known of the numerous complaints against defendants Coleman and Richardson. These complaints clearly illustrated defendants Coleman and Richardson's unfitness for the duties of their job and their dangerousness to the women in question.  Yet, defendants Housing Authority of Baltimore City and Paul T. Graziano violated their duty to terminate the employment of defendants Coleman and Richardson.

188)   As a result of the defendants' actions, the plaintiffs suffered and continue to suffer severe mental anguish as well as physical pain and suffering.

WHEREFORE, the plaintiffs each demand TEN MILLION DOLLARS ($10,000,000.00) in compensatory damages, punitive damages in an amount to be determined by a jury, costs and attorneys' fees, injunctive relief in the form of an order that all health or safety concerns in their homes be immediately abated, and such other relief as this Honorable Court deems appropriate.

## COUNT XII – NEGLIGENT ENTRUSTMENT
### (All Plaintiffs Versus the Housing Authority of Baltimore City and Paul T. Graziano)

189)   All paragraphs of this complaint, whether found above or below, not falling under this count, are incorporated herein by reference as if fully stated under this count.

190)   Defendants Housing Authority of Baltimore City and Paul T. Graziano bear direct responsibility for entrusting employees with keys to the plaintiffs' units and the power of the plaintiffs which defendants Coleman and Robertson wielded.

191)   Defendants Housing Authority of Baltimore City and Paul T. Graziano knew or should have known, prior to entrusting defendants Coleman and Robertson that they could not be trusted with such access or authority.

192)   Defendants Housing Authority of Baltimore City and Paul T. Graziano breached their duty to permit only qualified individuals to have keys and access to the plaintiffs' units as well as the other power over the plaintiffs with which defendants Coleman and Robertson were entrusted.

193)   As a result of the defendants' actions, the plaintiffs suffered and continue to suffer severe mental anguish as well as physical pain and suffering.

WHEREFORE, the plaintiffs each demand TEN MILLION DOLLARS ($10,000,000.00) in compensatory damages, punitive damages in an amount to be determined by a jury, costs and

attorneys' fees, injunctive relief in the form of an order that all health or safety concerns in their homes be immediately abated, and such other relief as this Honorable Court deems appropriate.

## COUNT XIII – FEDERAL UNCONSTITUTIONAL PATTERN AND PRACTICE
### (All Plaintiffs Versus the City of Baltimore, the Mayor and City Counsel of Baltimore and Paul T. Graziano)

194)     All paragraphs of this complaint, whether found above or below, not falling under this count, are incorporated herein by reference as if fully stated under this count.

195)     The violations of the United States Constitution detailed above are so ubiquitous as to constitute a pattern and practice by the Housing Authority of Baltimore City.

196)     In addition to the seven plaintiffs named in this case, there are dozens more who have bene subjected to the same unlawful patterns and practices.

197)     This pattern and practice rises to the level of the official policy of Baltimore.

198)     Defendants Housing Authority of Baltimore City and Paul T. Graziano knew or should have known of the policy of sexual harassment ruthlessly enforced against defenseless single women in Baltimore public housing.

199)     As a result of the defendants' actions, the plaintiffs suffered and continue to suffer severe mental anguish as well as physical pain and suffering.

WHEREFORE, the plaintiffs each demand TEN MILLION DOLLARS ($10,000,000.00) in compensatory damages, punitive damages in an amount to be determined by a jury, costs and attorneys' fees, injunctive relief in the form of an order that all health or safety concerns in their homes be immediately abated, and such other relief as this Honorable Court deems appropriate.

## COUNT XIV – MARYLAND "*LONGTIN* CLAIM" FOR
## UNCONSTITUTIONAL PATTERN AND PRACTICE
### (All Plaintiffs Versus the Housing Authority of Baltimore City and Paul T. Graziano)

200)     All paragraphs of this complaint, whether found above or below, not falling under this count, are incorporated herein by reference as if fully stated under this count.

201)     The violations of the Maryland Constitution detailed above are so ubiquitous as to constitute a pattern and practice by the City of Baltimore.

202)     In addition to the seven plaintiffs named in this case, there are dozens more who have been subjected to the same unlawful patterns and practices.

203)     This pattern and practice rises to the level of the official policy of the Housing Authority of Baltimore City.

204)     Defendants Housing Authority of Baltimore City and Paul T. Graziano knew or should have known of the policy of sexual harassment ruthlessly enforced against defenseless single women in Baltimore public housing.

205)     As a result of the defendants' actions, the plaintiffs suffered and continue to suffer severe mental anguish as well as physical pain and suffering.

WHEREFORE, the plaintiffs each demand TEN MILLION DOLLARS ($10,000,000.00) in compensatory damages, punitive damages in an amount to be determined by a jury, costs and attorneys' fees, injunctive relief in the form of an order that all health or safety concerns in their homes be immediately abated, and such other relief as this Honorable Court deems appropriate.

## COUNT XV – DECLARATORY JUDGMENT
### (All Plaintiffs Versus All Defendants)

206)     All paragraphs of this complaint, whether found above or below, not falling under this count, are incorporated herein by reference as if fully stated under this count.

207)     There is an actual controversy between the parties and within the jurisdiction of this Honorable Court.  The controversy is whether the plaintiffs are immediately entitled to have deficiencies affecting their safety and lives abated immediately without offering sexual favors in return.

208)     The plaintiffs respectfully request that this Honorable Court declare the rights and other legal relations of the parties and order that the necessary repairs be made at once.

WHEREFORE, the plaintiffs each demand TEN MILLION DOLLARS ($10,000,000.00) in compensatory damages, punitive damages in an amount to be determined by a jury, costs and attorneys' fees, injunctive relief in the form of an order that all health or safety concerns in their homes be immediately abated, and such other relief as this Honorable Court deems appropriate.

## JURY TRIAL DEMAND

The plaintiffs demand trial by jury.

Respectfully submitted,

HANSEL LAW, PC                                         HIRSCH & COSCA, PC


_____/s/_____                               _____/s/_____
Cary J. Hansel, No. 14722                             Annie B. Hirsch, No. 16681
2514 N. Charles Street                                2514 N. Charles Street
Baltimore, MD 21218                                   Baltimore, MD 21218
Phone: 301-461-1040                                   Phone: 410-864-8491
Facsimile: 443-451-8606                               Facsimile: 410-982-6597
cary@hansellaw.com                                    abh@hirschandcosca.com